UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

KEANDRE GLASPIE,

     Defendant.

Case No. 25-cr-20461

Honorable Robert J. White

---

**ORDER DENYING DEFENDANT'S
MOTION TO SUPPRESS (ECF No. 25)**

---

Defendant Keandre Glaspie moved to suppress evidence allegedly obtained in violation of the Fourth Amendment. (ECF No. 25).  The Government opposed the motion. (ECF No. 33).  The Court held a hearing on the motion on February 6, 2026.  For the reasons stated below, the Court will deny Glaspie's motion.

**I.     Background**

On May 14, 2025, a man walked into the Jackson Police Department (JPD) to report potential criminal activity – his conversation with JPD was captured on video. (Gov't Ex. 1; Gov't Ex. 1A; ECF No. 33-1, PageID.161).  He claimed that while in a nearby store, he observed another man enter, approach the counter, and warn the store owner that "there's about to be some shots fired over here, so if you hear shots get low." (ECF No. 33-1, PageID.161).  The witness stated the man was armed and

had "half a ski mask on." (*Id.*).  After the man made his comments to the store owner, he left and got into a dark gray Kia. (*Id.*).  The witness saw the man back the car up into the rear of the store's parking lot. (*Id.*).  The Kia had "all tinted windows" and a license plate the witness described as "not our plate from here." (*Id.*).

At the time he made the tip to JPD officers, the witness believed the Kia was still in the store's lot. (*Id.*).  The witness "wanted to say something" to officers "because it's weird. All them kids over here, outside playing right here, all this, and he's still there." (*Id.*).  In addition to the civilian employee who received the witness's tip, Sergeant Burkart testified that he was in the JPD office at the time and both saw and heard the witness.  Although the witness did not provide his name or address, Sergeant Burkart stated that he recognized the witness from prior interactions, though he did not immediately remember his name.

After JPD received the tip, Sergeant Burkart radioed a "be on the lookout" (BOLO) for the suspect.  Officers Louis Reynaga and Brian Beam both testified that the BOLO identified the car as a dark gray Kia parked in the back of the store's lot. Otherwise, the BOLO lacked any identifying information related to the suspect specifically, such as his appearance or race.  After issuing the BOLO, Sergeant Burkart headed toward the store in his patrol car.

According to his testimony, Officer Beam was parked in a marked police vehicle in the JPD lot when he heard the BOLO.  He immediately drove to the store,

which is located about three or four blocks from JPD.  Officer Beam parked outside of the store lot's gated fence and exited his vehicle.  He observed a Kia matching the BOLO's description; his body camera footage captured the vehicle backed into a spot behind the store and adjacent to a dumpster. (Gov't Ex. 6; ECF No. 33, PageID.146).   Additionally, Officer Beam noticed that the Kia had front-seat windows so tinted that he could not see the car's occupants.  The screenshot from his body camera footage shows the tint covers the entirety of the front windows. (Gov't Ex. 6; ECF No. 33, PageID.146).  Under Michigan law, it is a civil infraction for tint on the front-seat windows to extend more than four inches from the top of the window. Mich. Comp. Laws §§ 257.709(a), 257.683(6).

Within fifteen to twenty seconds of Officer Beam's arrival, the Kia began to drive away.  Officer Beam observed the Kia pull onto Martin Luther King Drive (MLK Drive) and turn left.  Officer Beam hopped into his car to follow.

Officer Louis Reynaga responded to the BOLO around the same time as Officer Beam.  Officer Reynaga testified that he received the BOLO over the radio while on patrol.  Officer Reynaga drove to the store and parked in a nearby alley, where he could view a Kia matching the BOLO's description.  The Kia drove off within thirty to sixty seconds of Officer Reynaga's arrival at the scene.  Officer Reynaga followed the vehicle.

According to Officer Reynaga, he drove northbound on MLK Drive.  As he did so, Sergeant Burkart drove southbound on MLK Drive.   Sergeant Burkart testified that he observed the Kia travelling northbound on MLK Drive; that the Kia made to turn eastbound onto Franklin Street; and in doing so, crossed over the double yellow lines on the roadway.  Sergeant Burkart's body camera footage corroborates his testimony. (Gov't Ex. 2; ECF No. 33, PageID.147).  In Michigan, "[i]f a roadway is divided into 2 or more clearly marked lanes for traffic," then "[a] vehicle must be driven as nearly as practicable entirely within a single lane." MCL § 257.642(1)(a). Failure to do so constitutes a civil infraction. § 257.642(5).

After witnessing the Kia cross over the double lines, Sergeant Burkart turned his lights on to initiate a traffic stop.  Officers Reynaga and Beam followed behind Sergeant Burkart' patrol car.  After the police lights flipped on, the Kia turned into an apartment complex and stopped a little after a stop sign. (Gov't Ex. 2; ECF No. 33, PageID.148).  Sergeant Burkart pulled behind the suspect, with Officers Reynaga and Beam arriving shortly thereafter.  Once parked, the driver of the Kia exited the vehicle, despite Sergeant Burkart's repeated instructions not to. (Gov't Ex. 2; Gov't Ex. 2A; ECF No. 33-2, PageID.162).  Officers testified that the driver wore a mask.

When the driver pulled his mask down, Officer Reynaga recognized him as Glaspie.  Although Sergeant Burkart did not immediately recognize Glaspie, he testified that he knew of Glaspie from other investigations and was aware of his

history of illegal drug and gun possession.  In fact, the day before the events took place, Glaspie's mother informed JPD to look out for her son in a black Kia riddled with bullet holes.

The body camera footage and accompanying transcript show that Glaspie also ignored the officers' instructions to place his hands on the vehicle. (Gov't Ex. 2; Gov't Ex. 2A).  At some point during the interaction, Officer Beam believed that Glaspie appeared ready to run.  As a result, Officer Beam placed his hands on Glaspie and arrested him for resisting and obstructing officers.  Upon arrest, Glaspie informed officers that the car was not his and that it was a rental. (Gov't Ex. 2; Gov't Ex. 2A; ECF No. 33-2, PageID.163).

In their briefs, Glaspie and the Government disputed whether the Kia was parked on the street or on the roadway. (ECF No. 25, PageID.104; ECF No. 33, PageID.148).  The body camera footage shows that Glaspie parked the Kia visibly past a stop sign on a street with no parking signs. (ECF No. 33, PageID.148).  Sergeant Burkart testified that the area was well known for its high crime rates and vehicle break-ins.  Sergeant Burkart also claimed that construction workers nearby indicated the Kia blocked their access to the road.

After arresting Glaspie, the officers prepared to tow the car and conducted an inventory search. (*Id.*).  Officers discovered a cross-body bag containing a Glock, model 27, .40 caliber pistol with an attached MCD and approximately 16 grams of

substances containing fentanyl. (*Id.* at PageID.149).  The officers found the cross-body bag on the driver's side in the rear seat.  Because of the findings, Glaspie faces charges for (1) possession of a controlled substance with intent to distribute, 21 U.S.C. § 841(b)(1)(C); (2) felon in possession of a firearm, 18 U.S.C. § 922(g)(1); and (3) illegal possession of a machine gun, 18 U.S.C. § 922(o). (ECF No. 12, PageID.24–25).

The Kia did not belong to Glaspie, but rather to Avis Budget Group (Avis). (Gov't Ex. 3; ECF No. 33-3, PageID.165).  Glaspie informed officers as much upon his arrest. (ECF No. 33-2, PageID.163).  Glaspie did not rent the Kia from Avis. Instead, another individual rented the Kia on April 14, 2025. (Gov't Ex. 3; ECF No. 33-3, PageID.165).  The rental agreement required the Kia to be returned by April 18, 2025; however, that date came and passed without the car's return. (Gov't Ex. 3; ECF No. 33-3, PageID.165).  On April 22, 2025, Avis sent a demand letter for the Kia's return. (Gov't Ex. 3; ECF No. 33-3, PageID.165).  In the weeks leading up to Glaspie's arrest, Alcohol, Tobacco, Firearms, and Explosives (ATF) agents and JPD officers observed Glaspie in possession of a similar dark gray Kia to the one recovered on May 14. (ECF No. 33, PageID.149).

At the hearing, ATF Agent Jessica Salley testified that the individual who rented the car gave Glaspie permission to use the vehicle.  The individual informed

6

Glaspie to return the car the next day, but Glaspie never did so.  The individual did not report the car as stolen.  Nor did Avis, even after the date for return passed.

## II.    Legal Standard

The Fourth Amendment protects the public from "unreasonable searches and seizures." U.S. Const. Amend. IV.   The protection applies to "persons, houses, papers, and effects." *Id.*   Courts analyze the reasonableness of a search or seizure under an objective standard. *Graham v. Connor*, 490 U.S. 386, 397 (1989).  "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.*  If evidence is obtained in violation of the Fourth Amendment, a court may forbid the prosecution from introducing that evidence at trial. *See Herring v. United States*, 555 U.S. 135, 139 (2009) ("[O]ur decisions establish an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial").

## III.    Analysis

Glaspie moved to suppress the evidence seized from the Kia. (ECF No. 25, PageID.87).  Glaspie argued that officers lacked probable cause to conduct a warrantless search of his car, and that officers acted unlawfully when they stopped and detained him in the first instance. (*Id.* at PageID.98–106).  Because Glaspie's seizure and subsequent search violated the Fourth Amendment, the Court should

7

suppress the illegally obtained firearm, ammunition, and controlled substances from admission at trial. (*Id.* at PageID.106).

The Government responded that Glaspie did not have standing to challenge the vehicle search because the Kia was stolen. (ECF No. 33, PageID.152–54). Likewise, officers had both probable cause and reasonable suspicion when they initially stopped and detained Glaspie, given Glaspie's civil infractions while driving and the witness's tip. (*Id.* at PageID.150–52). And even if Glaspie had standing to challenge the car's search, officers still did not violate the Fourth Amendment because (1) they had probable cause the car contained evidence of a crime and (2) the officers validly conducted an inventory search that would have inevitably unearthed the evidence. (*Id.* at PageID.154–58). Thus, the Government requested the Court deny Glaspie's motion.

## A.    Glaspie Lacks Standing to Challenge the Search of the Car.

As an initial matter, Glaspie did not have standing to challenge the officers' search of the Kia.  The evidence presented shows Glaspie did not have permission to use the vehicle at the time of his arrest.  He thus lacked a reasonable expectation of privacy in its contents, and the Court will decline to suppress evidence on these grounds.

"[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate

8

expectation of privacy that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (citation omitted).  Although a driver may have a reasonable expectation of privacy in a borrowed rental car, the Sixth Circuit distinguished instances where the driver did not have permission from the renter to drive the car. *United States v. Rogers*, 97 F.4th 1038, 1042–43 (6th Cir. 2024).  In such scenarios, it is unlikely the driver has a privacy interest, unless he or she shows otherwise. *Id.*  And if the driver stole the vehicle, they certainly do not have standing to challenge a search. *United States v. Hensel*, 672 F.2d 578, 579 (6th Cir. 1982) (holding driver "had no legitimate expectation of privacy in the stolen vehicle or its contents"); *see also United States v. Overton*, 600 Fed. App'x 303, 310 (6th Cir. 2014) ("a person who knowingly possesses a stolen vehicle has no legitimate expectation of privacy therein").  The Supreme Court echoed that sentiment. *See Byrd v. United States*, 584 U.S. 395, 409 (2018) ("No matter the degree of possession and control, the car thief would not have a reasonable expectation of privacy in a stolen car.").

Here, the car did not belong to Glaspie.  Based on Agent Salley's testimony, Glaspie at one point had permission to drive the Kia.  But that permission lasted only for one night.  Afterwards, the person who rented the car informed Agent Salley that Glaspie did not return the vehicle.  The Court presumes that at the time of the arrest, Glaspie drove the vehicle knowing he no longer had permission to.  Critically,

9

Glaspie offered no evidence to rebut that contention. *United States v. Russell*, 26 F.4th 371, 375 (6th Cir. 2022) (citation omitted) ("the defendant bears the burden of showing he has standing" for his Fourth Amendment claim). Because Glaspie did not "exhibit a legitimate expectation of privacy in the car *at the time of the search*," *Rogers*, 97 F.4th at 1042 (citation omitted), the Court finds Glaspie did not have standing to challenge said search.[1]

### B. Officers Properly Seized Glaspie.

In addition to his argument that officers searched his car illegally, Glaspie claimed that officers violated the Fourth Amendment when they first pulled him over and detained him. But after reviewing the evidence, the Court finds officers did not act unlawfully when they seized Glaspie.[2]

"A vehicle stop constitutes a seizure within the meaning of the Fourth Amendment." *United States v. Calvetti*, 836 F.3d 654, 665 (6th Cir. 2016) (citation omitted). "In order to effect a traffic stop, an officer must possess either probable

---

[1] Under Michigan law, a person that rents a motor vehicle and intentionally fails to return it as provided in the rental agreement is guilty of larceny. MCL § 750.362a(1). Although Avis issued a demand letter to the renter indicating the car was past due, (Gov't Ex. 3), the evidence at the hearing did not show Glaspie (1) knew of the demand letter and (2) intentionally failed to return the vehicle. Regardless, Glaspie no longer had permission from the renter to drive the Kia.

[2] Fourth Amendment standing is not jurisdictional, so the Court will consider the merits of Glaspie's remaining arguments.

cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012).  The officers here had both.

To start, "[p]robable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008).  The officers personally witnessed Glaspie operate a vehicle with an illegal window tint and fail to stay in his lane. (ECF No. 33, PageID.146–47, 150).  The body camera footage memorialized Glaspie's acts. (*Id.* at PageID.146–47).  It is clear from the footage that Glaspie committed multiple civil infractions.  *See* MCL §§ 257.709(a), 257.683(6), 257.642(1)(a), 257.642(5).  So officers had probable cause to stop Glaspie.

Officers also had reasonable suspicion that Glaspie was engaged in an on-going crime.  To justify a brief, investigative stop like the one here, "an officer must point to specific, articulable facts that gave rise to a 'reasonable suspicion' that the suspect was engaged in criminal activity." *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).  "A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Gross*, 662 F.3d at 399 (citation omitted)  (citation modified).  The officer's suspicion must be more than a "hunch." *Blair*, 524 F.3d at 750.

Here, the officers received a tip that a man entered a local store armed and warned the store owner to anticipate gunfire. (ECF No. 33-1, PageID.161).  The man then left the store and got into a dark gray Kia parked in the back of the store's parking lot. (*Id.*).  The witness noted the Kia had tinted windows and an out-of-state license plate. (*Id.*).  The witness stated he was concerned about the safety of the children playing in the area. (*Id.*).

The witness's tip possessed several characteristics beyond its content that support the officers' reasonable suspicion.  The witness provided the tip shortly after observing the described sequence of events. *See Navarette v. California*, 572 U.S. 393, 399 (2014) (holding witness's firsthand observation of suspected criminal activity "lends significant support to the tip's reliability").  The witness also reported the tip in person, allowing officers to "observe the [witness's] demeanor and credibility." *Henness v. Bagley*, 644 F.3d 308, 318 (6th Cir. 2011).  And at least one officer recognized the witness. (ECF No. 33, PageID.146).  If the tip was false, then, the officers could hold him accountable. *See Henness*, 644 F.3d at 318.

Moreover, officers independently corroborated the tip, bolstering their reasonable suspicion.  Officers drove to the store after they received the tip and observed a Kia at the back of the store's parking lot consistent with the witness's description. (ECF No. 133, PageID.146).  The Supreme Court in *Navarette* held that "officers' corroboration of certain details" makes an "anonymous tip sufficiently

12

reliable to create reasonable suspicion of criminal activity." *Id.* at 398.  So even if the witness here gave neither his name nor address, officers could rely on his tip based on their own investigation of the matter.

Overall, the fact that the witness made his statement in-person and contemporaneous with the incident, and that officers verified his information, makes the tip trustworthy.  The officers had enough information to believe that the person driving the Kia had a gun in the car, potentially in violation of MCL § 750.227.  The officers therefore did not act in violation of the Fourth Amendment when they stopped the vehicle.

**C.      The Officers Had Probable Cause to Search the Car.**

Although the Court already determined that Glaspie lacked standing to challenge the search of the Kia, the Court finds that the search was lawful regardless. "[T]he Supreme Court has long recognized an exception to the warrant requirement with respect to searches of vehicles." *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007).   "Under the automobile exception, police officers may conduct a warrantless search of a vehicle if they have 'probable cause to believe that the vehicle contains evidence of a crime.'" *Id.* (quoting *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998)).  Probable cause is "a flexible, commonsense standard that requires that the facts available to the officer would warrant a man of reasonable caution to believe that a crime is afoot." *United States v. Heald*, 189 Fed. App'x 390,

393 (6th Cir. 2006) (citation omitted) (citation modified).  As relevant here, probable cause may come from an informant's tip when that tip is sufficiently detailed and corroborated by the independent investigation of law enforcement officers. *Smith*, 510 F.3d at 648.  Likewise, "strange behavior and [a] criminal history" can help establish probable cause. *United States v. Peake-Wright*, 126 F.4th 432, 438–39 (6th Cir. 2025).

Based on the totality of the circumstances, officers had sufficient information to justify their search.  First, the witness informed police that a man in a gray Kia was armed and made concerning statements. (Gov't Ex. 1; Gov't Ex. 1A; ECF No. 33-1, PageID.161).  Second, officers corroborated the tip about the Kia and its location, locating the vehicle within minutes. (Gov't Ex. 6; ECF No. 33, PageID.146).  Third, the witness stated that the man had a ski mask on; when Glaspie exited the Kia, officers observed him with a mask over his head. (ECF No. 33, PageID.148; Gov't Ex. 1A; ECF No. 33-1, PageID.161).  Fourth, Glaspie exited the vehicle despite officer's instructions to remain in the car. (ECF No. 33, PageID.148; ECF No. 33-2, PageID.162–63).  Fifth, Glaspie told officers that there was nothing in the car and that they could not take the car even though it did not belong to him. (Gov't Ex. 2A; ECF No. 33-2, PageID.163).  Sixth, officers testified that they knew Glaspie had a history of illegal firearm and drug possession.

Officers could surmise that Glaspie had a gun in his car.  And because Glaspie was a previously convicted felon, he could not lawfully possess a firearm.  As a result, the Court finds the officers believed reasonably that Glaspie was committing a crime, so the officers did not violate the Fourth Amendment when they searched the Kia.

### D.      Officers Conducted a Valid Inventory Search.

In addition, the officers' valid inventory search would have inevitably led them to the evidence, regardless of whether or not they had probable cause.  "An inventory search is a recognized exception to the Fourth Amendment's warrant requirement: where the police are in lawful custody of a vehicle, they may conduct an inventory search to catalogue its contents pursuant to standardized criteria." *United States v. Alexander*, 954 F.3d 910, 915 (6th Cir. 2020).  Inventory searches are intended to protect an owner's property while it is in the custody of police and to guard police from danger. *Florida v. Wells*, 495 U.S. 1, 4 (1990).  Such searches "are valid only to the extent that officers follow a standardized criteria or established routine" to assure that the search is not taken for investigatory purposes. *Alexander*, 954 F.3d at 915 (citation omitted) (citation modified).  But a "police officers may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." *Wells*, 495 U.S. at *4.

15

Here, JPD policy states that when the operator of a vehicle is arrested, the arresting officer "should provide reasonable safekeeping by leaving the vehicle secured and lawfully parked at the scene" or when appropriate, "by having the vehicle towed." (Gov't Ex. 4; ECF No. 33-4, PageID.167).  The officer may have a vehicle towed if the "vehicle presents a traffic hazard or the vehicle would be in jeopardy of theft or damage if left at the scene." (Gov't Ex. 4; ECF No. 33-4, PageID.167).  Although officers may not tow a vehicle if "reasonable alternatives exist," officers should make that determination considering "public safety" and the "reasonable safety of the vehicle and its contents." (Gov't Ex. 4; ECF No. 33-4, PageID.167).  Under JPD policy section 502.9, officers must search a towed vehicle and document personal property contained therein. (*Id.*).

Officers at the scene determined the vehicle blocked the roadway.  The footage shows that Glaspie parked the vehicle past the stop sign and in such a way that it could block traffic. (Gov't Ex. 2; ECF No. 33, PageID.148).  Officers also noted that the high-crime area rendered the vehicle and its contents unsafe where parked.  After reviewing the Government's evidence and considering its arguments, the Court agrees with the officers' decision to tow the vehicle.  And in such a scenario, JPD policy requires officers to search and inventory the car, including the car's back seat. (ECF No. 33-4, PageID.169).  Hence, officers would have inevitably discovered the cross-body bag and its contents even without probable cause. *See Nix v. Williams*,

16

467 U.S. 431, 444 (1984) (holding courts should not exclude evidence if sufficient proof is presented that the evidence "would have been discovered by lawful means"). For all of the reasons stated above, then, the Court will deny the motion to suppress.

* * *

For the reasons given, the Court **ORDERS** that the motion to suppress evidence seized in violation of defendant's Fourth Amendment rights (ECF No. 25) is **DENIED**.

Dated: February 10, 2026                         s/Robert J. White
                                                                    Robert J. White
                                                                    United States District Judge

17